Louis J. Ferris and Jean H. Ferris v. Commissioner. Louis J. Ferris v. Commissioner.Ferris v. CommissionerDocket Nos. 77646, 77647.United States Tax CourtT.C. Memo 1962-94; 1962 Tax Ct. Memo LEXIS 215; 21 T.C.M. (CCH) 499; T.C.M. (RIA) 62094; April 24, 1962*215 1. Respondent's use of increase in net worth and nondeductible expenditures method of computing petitioners' income approved. 2. Petitioners' unreported income determined. Opening cash on hand not established. 3. At least part of deficiency in each year found due to fraud with intent to evade tax. Additions to tax for fraud approved. George B. Lourie, Esq., 7 Water St., Boston, Mass., and Arnold R. Cutler, Esq., for the petitioners. Frank V. Moran, Jr., Esq., for the respondent. DRENNENMemorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings, respondent determined the following deficiencies in income tax and additions to tax: Additions to TaxI.R.C. 1939I.R.C. 1954DocketSec.Sec.No.YearDeficiencySec. 293(b)294(d)(1)(A)294(d)(2)Sec. 6653(b)776471944$1,337.11$ 684.05$125.56$ 83.7119452,797.561,398.78172.0519466,626.473,313.24601.88401.2519475,546.432,773.22499.17332.7919485,937.342,968.67546.05364.0519493,951.991,976.00366.40244.2619502,996.601,498.30273.84182.5619519,203.874,601.94824.76549.8319526,115.633,057.82549.14366.097764619531,191.63595.8277.8319541,500.81142.0892.16$750.4119551,878.90939.45*216 The issues for decision are: 1. Whether the income of petitioner Louis J. Ferris is properly reconstructed by a computation of net worth plus nondeductible expenditures for the years 1944 through 1955, as determined by respondent. 2. Whether all or at least part of the deficiency in income tax, if any, for each of the years 1944 through 1955 is due to fraud with intent to evade tax. 3. Whether assessment and collection of any deficiencies for the years 1944 through 1951 are barred by the statute of limitations. 4. Whether petitioners are liable for the additions to tax prescribed by section 294(d)(1)(A) of the 1939 Code for the years 1944, 1946 through 1952, and 1954, and for the additions to tax prescribed by section 294(d)(2) of the 1939 Code for the years 1954 and 1953. Respondent concedes that petitioners are not liable for the additions to tax under the provisions of section 294(d)(2) of the 1939 Code for the years 1944, 1946 through 1952, and 1954. Findings of Fact Petitioners Louis J. Ferris and Jean H. Ferris (hereinafter referred to as Louis and Jean, respectively) are husband and wife, having been married on August 7, 1952. Louis filed his individual Federal*217 income tax returns for the taxable years 1944 through 1951 with the then collector of internal revenue in Vermont, and his individual return for the taxable year 1952 with the district director of internal revenue for the district of Vermont. Louis and Jean filed their joint Federal income tax returns for the years 1953 through 1955 with the district director of internal revenue for the district of Vermont. Louis was born in Claremont, New Hampshire, in 1905. When he was about 5 years old his parents returned to Lebanon, taking Louis with them. His father died when Louis was 7 or 8 years old. He attended the equivalent of American grade school and studied some English in Lebanon. When he was about 20 years old he went to Mexico from Lebanon. He lived in Mexico for some 7 years with two uncles, Alberto and Salvador. When he was about 27 years old he went to Miami, Florida, from Mexico. He stayed in Miami a short time and then went to Barre, Vermont, where his sister lived. He settled in the vicinity of Morrisville, Vermont, in about 1936 or 1937. Louis and his first wife were divorced in 1943 and Louis married Jean in 1952. During the period here involved, Louis resided in Morrisville*218 and was engaged in the drycleaning business, d.b.a. Quality Dry Cleaning, and was the owner and lessor of commercial and residential properties. During the years 1950 to 1955 he maintained a drycleaning shop in both Morrisville and Hardwick, Vermont. In 1950 the population of Morrisville was 1,995 persons and of Hardwick was 1,696 persons. Also, during the years 1952 through 1955, Louis was engaged in the business of erecting and maintaining signs, d.b.a. Morrisville Sign Company. From November 1943 to November 1952 Louis employed Connie O. Rybak (hereinafter referred to as Connie) in his drycleaning establishment at Morrisville. It was her job to check clothes which were brought into the shop by customers and by truck, to receive payments of rent from Louis' tenants and to give them receipts for the rental payments, and to close the cleaning shop and clear out the cash register on nights when Louis was not in the shop. When a tenant came in the shop and gave Connie a rental payment she would ring up the amount on the cash register. If she was busy when the tenant came in she would not ring up the amount right away but would do it later. After putting the amount in the cash register*219 she would write a rent receipt for the tenant. Such receipts were taken from a book of printed forms, with four receipt forms, serially numbered, to a page. A carbon copy of each receipt was made and retained in the bound book. At the date of the trial, Louis' rent receipts books for the years 1944 through 1946 were not available; they had been destroyed in a fire in 1947. Connie noted on the cash register tape the name of the tenant beside the amount of the rental payment. Connie also rang up on the cash register cash receipts from the cleaning business. She would note on the register tape, beside the amount of the receipt, whether the amount was received from the shop or from the drivers of the trucks. Once every week or every 2 weeks, Connie would transcribe the information from the cash register tapes to a cash receipts book which showed the cash receipts by day, and the totals by week, from cleaning of clothes brought to the shop by customers, from cleaning of clothes brought to the shop by the truckdrivers, and from rents. This cash receipts book purported to show daily cash receipts from the three sources from January 3, 1944, to July 28, 1946, from January 3 to May 22, 1949, and*220 from January 2, 1950, through December 1952. Connie also maintained a composition book for the years 1951 and 1952 in which she recorded cash register readings for each day and the checks received for rent or other purposes. These totals, less expenses paid by cash, which she recorded, and less withdrawals by Louis, which she also recorded, represented bank deposits of the business. After Connie left Louis' employ in November 1952, Jean kept the composition book through 1955. There were also blank books in which were recorded, at the time the customer brought clothes into the shop, the name of the customer, the articles left for drycleaning, and the amount to be charged. During the taxable years here involved Louis owned real estate consisting of stores and apartments which were occupied by tenants as follows: Year or PeriodApartmentsStoresTenants194412326Jan. 1 to Oct. 15, 194512320Oct. 15 to Dec. 31, 194514420194614425194714435194816433194916431Jan. 1 to Mar. 1, 195016445Mar. 1 to Dec. 31, 195026545195126555195226553195326548195426552195526550*221 During the taxable years here involved the rents on approximately two-thirds of the apartments owned by Louis were received on a weekly basis. The remaining one-third of the apartment rents and the rents from the stores owned by Louis were received on a monthly basis. During the taxable years 1944 to 1951, inclusive, Louis' correct rent receipts, the rent receipts per the rent receipts book, and the rent receipts reported by Louis on his returns for those years were as follows: RentRentsCorrectedreceiptsperrentYearbookreturnreceipts1944$1,450.00$ 2,306.4019452,600.002,991.3119463,350.003,500.001947$ 4,023.503,005.007,332.3319487,133.353,439.509,639.0319498,406.484,500.009,914.45195011,033.599,586.7212,979.09195111,409.279,809.0515,534.02 Some additional rental receipts may have been recorded in the cash receipts book as drycleaning income by mistake. On their tax returns for the years 1952, 1954, and 1955, petitioners reported receipts from the sign business in the amounts of $5,147.28, $1,863.60, and $3,484.50, respectively. No books or records offered in evidence purport*222 to reflect any income from the sign business. During the period that Connie worked for Louis, she prepared, or helped prepare, summaries of Louis' business income and deductions. She used pieces of wrapping paper from the drycleaning shop for these summaries. Typical of these summary sheets is one on brown wrapping paper for 1950. Connie penciled vertical lines on the paper, marking columns at the top of which she wrote categories of deductions, such as repairs, steam for drycleaning, taxes and insurance, wages, and janitor service. Connie entered some figures in these columns; other figures and categories were made by someone else. Attached to the sheet was an adding machine tape, showing monthly totals of receipts as shown by the cash receipts book. This summary sheet was used in the preparation of Louis' income tax return for 1950. Connie's summary sheets were also used in the preparation of returns for other years. Petitioners' income tax returns for the years 1946 and 1947 and for the years 1952, 1953, 1954, and 1955 were prepared by two different attorneys in Morrisville, both of whom worked from summary sheets of wrapping paper. The attorneys used only total figures from*223 the sheets and had no personal knowledge of the amounts of income or deductions shown on the summary sheets or on the returns. By a three-count indictment filed March 8, 1956, Louis was charged with wilfully and knowingly attempting to evade and defeat income tax owed by him by filing false and fraudulent Federal income tax returns for the years 1949, 1950, and 1951. Louis pleaded not guilty to the charges. The case came on for trial in the United States District Court for the District of Vermont, and after the presentation of the case for the Government and after testifying, Louis changed his plea to guilty and was adjudged convicted on his plea of guilty. He was sentenced to 6 months' imprisonment on each of the three counts, the sentences to run concurrently and he was fined $3,000 with costs. One reason Louis pleaded guilty in the criminal trial was that his attorney advised him that if he testified in the proceeding that he had a cash hoard before the period involved in the trial for tax evasion, he would be subject to prosecution for perjury by the State of Vermont, since he had testified in his divorce case in 1943 that he had no money. Louis' counsel told him that the Government*224 had a copy of the transcript of the divorce proceeding in which he had testified that he had no funds. During the examination and investigation by agents of respondent which resulted in these proceedings, Louis gave a statement to the examining officers in the presence of a stenographer who made a transcript of the questions asked by the examining officers and of the answers given by Louis. This statement was given on September 24, 1952. During the interview, Louis was asked if he had received any money from Mexico since he came into the United States and Louis answered, "Not very much." When asked more specifically how much, Louis said, "Few thousand dollars" and "between $2,000 and $3,000" received by money order and by check. The following schedule reflects Louis' net worth at the end of each of the years 1943 through 1955; and his nondeductible expenditures and losses, his nontaxable receipts, his correct adjusted gross income, his reported adjusted gross income, and his unreported adjusted gross income for each of the years 1944 through 1955: 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-31-4412-31-4512-31-4612-31-47ASSETSCash in banks: Union Svgs. (Comm.)$ 221.36$ 312.92$ 352.78$ 330.54$ 1,384.41Union Svgs. (Svgs.)72.57107.022.435,910.393,086.72Lamoille County Bank1,405.6674.288,350.0911,079.06Hardwick Trust Co.Automobiles1,225.002,250.00Real estate: Champeau Block3,800.003,800.003,800.003,800.003,800.00Improvements900.002,900.0018,768.40Billings Block4,000.004,000.004,000.004,000.004,000.00Flat Iron Block1,250.00833.342,433.342,433.342,433.34Ferris BuildingLake Elmore300.00300.00Portland Street Block6,000.006,000.006,000.00Morrisville, land3,500.00Furnishings, apts.1,118.24Stock-Msvle. Sign Co.Bus. plant & equip.:4,000.004,000.004,000.004,000.004,000.00Couture plantBeauty parlor equip.534.00Trucks2,000.002,000.002,000.002,000.002,225.00BoatTOTAL ASSETS$15,877.93$16,458.94$23,562.83$41,249.36$63,945.17LIABILITIESMortgage payable$ 3,936.78$ 3,104.06$ 1,000.00Notes payable - Mrs.1,500.00A. DowneeUnion Svgs. Bank1,000.002,470.00Reserve fordepreciation: Buildings1,568.342,000.012,656.683,613.354,570.02Trucks1,733.672,000.002,000.002,000.001,163.34Plant equipment1,330.001,596.001,862.002,128.002,394.00Furnishings55.91AutomobilesAccounts payable -Lewis Corp.Pilgrim LaundryTOTAL LIABILITIES$11,068.79$ 8,700.07$ 7,518.68$ 7,741.35$10,653.27NET WORTH$ 4,809.14$ 7,758.87$16,044.15$33,508.01$53,291.90PRIOR YEAR'S NET WORTH4,809.147,758.8716,044.1533,508.01INCREASE IN NET WORTH$ 2,949.73$ 8,285.28$17,463.86$19,783.89ADD: Living expenses1,800.001,800.001,800.001,800.00Loss on sale of carDEDUCT: Insuranceproceeds (nontaxable)6,707.19Corrected adjusted$ 4,749.73$10,085.28$19,263.86$14,876.70gross incomeReported adjustedgrossincome (Loss)680.301,049.30913.13(195.82)Unreported adjusted$ 4,069.43$ 9,035.98$18,350.73$15,072.52gross income*225 12-31-4812-31-4912-31-5012-31-51ASSETSCash in banks: Union Svgs. (Comm.)$ 1,026.55$ 622.79$ 232.91$ 1,112.48Union Svgs. (Svgs.)2,934.954,138.651,191.831,215.77Lamoille County Bank14,807.966,665.55805.641,021.82Hardwick Trust Co.Automobiles2,795.004,765.004,765.004,765.00Real estate: Champeau Block3,800.003,800.003,800.003,800.00Improvements27,819.9127,819.9127,819.9127,819.91Billings Block4,000.004,000.004,000.004,000.00Flat Iron Block2,433.342,433.342,433.342,433.34Ferris Building27,578.4548,013.6254,586.97Lake Elmore300.00300.00600.00600.00Portland Street Block6,000.006,000.006,000.006,000.00Morrisville, land3,500.005,700.005,700.005,700.00Furnishings, apts.1,548.792,146.405,636.336,007.77Stock-Msvle. Sign Co.2,000.002,000.00Bus. plant & equip.:5,100.005,100.005,229.101,215.77Couture plant3,350.00Beauty parlor equip.Trucks1,775.001,775.001,517.463,342.46Boat550.00550.00550.00550.00TOTAL ASSETS$ 78,391.50$103,395.09$120,295.14$133,534.62LIABILITIESMortgage payable$ 13,000.00$ 18,000.00$ 13,000.00Notes payable - Mrs.A. DowneeUnion Svgs. Bank$ 470.002,800.001,000.00Reserve fordepreciation: Buildings5,526.697,616.559,706.4111,796.27Trucks445.00800.00288.91774.90Plant equipment2,715.003,091.003,476.003,843.00Furnishings189.26373.02760.161,340.37AutomobilesAccounts payable -Lewis Corp.Pilgrim LaundryTOTAL LIABILITIES$ 9,345.95$ 24,880.57$ 35,031.48$ 31,754.54NET WORTH$ 69,045.55$ 78,514.52$ 85,263.66$101,780.08PRIOR YEAR'S NET WORTH53,291.9069,045.5578,514.5285,263.66INCREASE IN NET WORTH$ 15,753.65$ 9,468.97$ 6,749.14$ 16,516.42ADD: Living expenses1,800.001,800.002,500.002,500.00Loss on sale of carDEDUCT: Insuranceproceeds (nontaxable)Corrected adjusted$ 17,553.65$ 11,268.97$ 9,249.14$ 19,016.42gross incomeReported adjustedgrossincome (Loss)1,526.021,468.46956.25283.05Unreported adjusted$ 16,027.63$ 9,800.51$ 8,292.89$ 18,733.37gross income*226 12-31-5212-31-5312-31-5412-31-55ASSETSCash in banks: Union Svgs. (Comm.)$ 2,068.44$ 971.47$ 1,714.85$ 2,947.72Union Svgs. (Svgs.)1,656.592,173.152,212.612,762.07Lamoille County Bank4,315.244,401.635,082.057,494.19Hardwick Trust Co.713.981,434.241,173.172,009.30Automobiles5,208.245,208.245,208.245,155.80Real estate: Champeau Block3,800.003,800.003,800.003,800.00Improvements27,819.9129,064.5430,498.5931,459.04Billings Block4,000.004,000.004,353.544,445.99Flat Iron Block2,433.342,433.342,433.343,415.04Ferris Building54,586.9754,586.9754,940.5155,464.20Lake Elmore600.00600.00600.00600.00Portland Street Block6,000.006,000.006,000.006,000.00Morrisville, land5,700.005,700.005,700.005,700.00Furnishings, apts.7,204.408,471.158,471.158,816.15Stock-Msvle. Sign Co.2,000.002,000.002,000.002,000.00Bus. plant & equip.:7,287.1013,446.4414,380.5914,380.59Couture plant3,804.523,804.523,804.523,804.52Beauty parlor equip.Trucks3,961.124,639.455,203.205,203.20Boat550.00550.00550.00550.00TOTAL ASSETS$143,709.85$153,285.14$158,126.36$166,007.81LIABILITIESMortgage payable$ 10,000.00$ 7,000.00$ 2,000.00Notes payable - Mrs.A. DowneeUnion Svgs. BankReserve fordepreciation: Buildings15,307.3419,083.0322,957.3626,872.09Trucks1,209.211,743.552,109.753,040.39Plant equipment4,692.545,975.677,133.478,551.98Furnishings2,125.533,240.704,501.485,624.31Automobiles99.261,158.001,789.65424.90Accounts payable -Lewis Corp.1,965.00Pilgrim Laundry400.00TOTAL LIABILITIES$ 33,433.88$ 40,565.95$ 40,491.71$ 44,513.67NET WORTH$110,275.97$112,719.19$117,634.65$121,494.14PRIOR YEAR'S NET WORTH101,780.08110,275.97112,719.19117,634.65INCREASE IN NET WORTH$ 8,495.89$ 2,443.22$ 4,915.46$ 3,859.49ADD: Living expenses4,000.002,500.002,500.002,500.00Loss on sale of car1,208.241,227.50DEDUCT: Insuranceproceeds (nontaxable)Corrected adjusted$ 13,704.13$ 4,943.22$ 7,415.46$ 7,586.99gross incomeReported adjustedgrossincome (Loss)1,468.252,304.502,620.93566.10Unreported adjusted$ 12,235.88$ 2,638.72$ 4,794.53$ 7,020.89gross income*227 Louis did not have any appreciable amount of cash on hand, other than in banks, at December 31, 1943. Louis did not file a declaration of estimated tax for the taxable years 1944 and 1946 to 1952, inclusive, and petitioners did not file a declaration of estimated tax for the taxable year 1954. Louis and petitioners substantially underestimated his or their estimated tax within the meaning of section 294(d)(2) of the 1939 Code for the years 1945 and 1953, respectively. Louis' Federal income tax returns for the years 1944 through 1952 and petitioners' joint income tax returns for the years 1953 through 1955 were false and fraudulent with intent to evade tax. At least part of the deficiencies due from Louis for each of the years 1944 through 1952 and from petitioners for each of the years 1953 through 1955 is due to fraud with intent to evade tax. For each of the years 1952, 1953, and 1954 the parties executed valid waivers extending the period of limitation within which an assessment of income tax may be made beyond the date on which the notice of deficiency herein was mailed to petitioners. Opinion The deficiencies determined herein by respondent result from a reconstruction*228 of income by the net worth and nondeductible expenditures method. The net worth span is 12 years, 1944-1955, inclusive, and the parties have stipulated all assets, liabilities, nondeductible expenditures, and nontaxable receipts for the period, except cash on hand. Respondent allowed no cash on hand, except cash in banks at the beginning of the period. Louis claims he had $70,000 to $75,000 cash on hand in his safe at the beginning of 1944, which he had inherited from an uncle in Mexico in 1938 or 1939, most of which he had used in acquiring assets by the end of 1949, and the final $5,000 of which he used sometime between 1950 and 1955. Giving no consideration to cash on hand, Louis' stipulated net worth at December 31, 1943, was $4,809.14 and at December 31, 1955, was $121,494.14, an increase of $116,685 during the period involved. Adjusting the net worth increase by the stipulated nondeductible expenditures and nontaxable receipts, but again giving no consideration to cash on hand, the indicated adjusted gross income over the entire 12-year period was a total of $139,713.55. Petitioners reported adjusted gross income totaling $13,640.47 over the period, indicating unreported income*229 during the period of $126,073.08 if there was no cash on hand at the beginning of the period which was used during the period. Despite this rather sizeable increase in net worth, and rather consistent pattern of unreported income over the years, petitioners contend that Louis' books and records were adequate and correctly reflected his income, at least for the years for which they were available, and that respondent may not employ the net worth method in determining the deficiencies for any of the years in controversy. The pattern of facts in this case is strikingly similar to the pattern of facts in , wherein the Supreme Court held that the Government may use the net worth method in determining a taxpayer's correct taxable income, and to prove fraud in a criminal tax evasion case, even though the taxpayer's books are apparently adequate and no false entries are detected therein. Here petitioners' accountant-witness testified that, for the period 1952 to 1955, Louis' books could be reconciled to bank deposits and that the returns for those years were made from the books, and further, that he could compute taxable income*230 from the books and records. However, the witness had no way of checking the source of the book entries and his testimony, when compared with the increase in net worth over the same period, even using the cash on hand petitioners claim to have had at the beginning of 1952, simply emphasizes that while the books and returns may have been consistent, there must have been many items of income that disappeared before reaching the recording stage. See While in the trial of this case respondent did not enlighten the Court to any great extent through the testimony of his agents whether they attempted to determine petitioners' income from Louis' books and records, in what respects they found the books to be inadequate, or why they used the net worth method for computing income, it does appear from the record as a whole that respondent's agents did request from Louis all his books and records and examined those he offered at that time, and that there is a rather large unexplained discrepancy between Louis' income as shown on his books, records, and returns and his income as computed on the net worth basis, even accepting Louis' claim of $75,000*231 cash on hand. It is apparent Louis' books and records were not accurate or adequate. The net worth method is not a system of accounting; it is merely evidence of income. , affd. (C.A. 4, 1955), certiorari denied . "[Where] the employment of the net worth method reveals a substantial gap between reported income and the increase in net worth, the latter may be taken as a guide for determining the amount of income actually received." . Under the circumstances here, we think respondent was clearly entitled to resort to the net worth method to determine petitioners' income. Petitioners have failed to show that Louis' books and records would more accurately reflect their correct income. We recognize the admonition of the Supreme Court in Holland that trial courts should approach net worth cases carefully, particularly where fraud is charged, with the full realization that the method is often difficult for even the innocent taxpayer to refute, particularly where there has been a considerable lapse of time between the beginning*232 net worth date and the time of trial. However there is no indication in the record that there was too much difficulty in determining petitioners' assets and liabilities in this case, except for cash on hand, and information with respect to the latter item was peculiarly within Louis' knowledge. Petitioners also argue that because respondent introduced no evidence to show that he tracked down all reasonable leads furnished by petitioners as to a nontaxable source of the apparent increase in net worth, such failure should detract from the cogency of respondent's proof of the deficiencies. Unfortunately, respondent did not have his agents testify in any detail with regard to their investigation. But from the record before us it appears that the only lead suggested by petitioners was the Mexican inheritance, and respondent had available the sworn testimony of Louis in his divorce proceedings that he had no cash in 1943 and his recorded statement made to the investigating agents that he had received only a small amount, possibly a few thousand dollars, from Mexico at some time. Under the circumstances, we do not think respondent was required to track down this lead any further. Turning*233 then to the amount of the deficiencies, if any, the burden of proof is on petitioners to show wherein respondent's determinations are wrong. Petitioners made no effort to show when and for what purpose the claimed cash on hand was used but seem to rely on proof of such a large error in respondent's opening net worth, the failure to allow $75,000 cash on hand, as to make respondent's computation unreliable and devoid of any presumption of correctness. Proof of the existence of a large cash hoard at the beginning of 1944 would show error in respondent's determination because a reasonably accurate starting point is a prerequisite to use of the net worth method. This is a question of fact. Respondent relies on Louis' sworn testimony in his divorce proceedings in 1943 that he had no cash at that time, his statement to the revenue agents that he had received only a few thousand dollars from Mexico, the fact that Louis borrowed small sums of money, ranging from $50 up to $3,000, from commercial lenders on various occasions between 1940 and 1945, and on numerous inconsistencies in Louis' testimony, to discount petitioners' claim of a large sum*234 of cash on hand at the beginning of 1944. Petitioners' evidence on this crucial point consisted primarily of Louis' own testimony, the testimony of a gas company employee who said he saw money in Louis' safe in 1939, the testimony of two of Louis' relatives, taken in Mexico on written interrogatories, and the proferred affidavit of a deceased resident of Morrisville, Vermont, with respect to seeing a check for $20,000 drawn on a Mexican bank in Louis' possession sometime between 1940 and 1943. In a nutshell, Louis' story is as follows. Having moved from the United States to Lebanon with his family when he was about 5 years old, Louis remained in Lebanon after his father's death until he was 20 years old. He then went to Mexico in about 1926 where he stayed with his uncles Alberto and Salvador until about 1932 when he moved to Vermont near his sister and eventually settled in Morrisville, Vermont, where he went into the drycleaning business. In late 1937 Salvador wrote petitioner that his uncle Alberto, who had been in the business of selling goods at wholesale in Mexico, had died and wanted his estate to go to Louis. It took some time to liquidate the business and Louis did not*235 go to Mexico until late 1938 or early 1939, at which time Salvador turned over $75,000 in American cash money to him, representing Alberto's net estate. Louis did not want to carry the money back with him so he left it with another uncle in Mexico, who sent the money to Louis in Vermont in the form of three checks, one for $35,000, and two for $20,000 (or $19,000 and $21,000). Louis held the checks for a while and then took the two smaller checks to a friend in the bank at Morrisville who cashed them for him. He put this cash in his safe in his office. A while later he took the $35,000 check with him to Miami where, after some problems of identification and a 2 weeks' delay, a bank cashed this check for him. He used some of the cash to buy an automobile and put the rest of it in a package wrapped up in clothing in the trunk of his car until he returned to Vermont. He also put this cash in his office safe where he kept it until about 1944. Louis was having marital difficulties in 1939 and he did not want his wife to know about his inheritance for fear she would take it all in a divorce action - therefore he did not use the cash until after his divorce in 1943. He perjured himself*236 in the divorce proceedings to keep his wife from getting any of this inheritance, which he did not think she deserved. After the divorce he began using the cash to acquire assets, and finally spent most of the balance in 1949 and 1950 when he built a building in Morrisville. He had about $5,000 left in 1950 which he either spent between 1950 and 1955 or used in 1956 at the time of his criminal trial for income tax evasion. Louis felt that half of the inheritance was intended for his sister. He used the money but gave her a mortgage for $4,800 in 1943, for $2,000 in 1945, and for $25,000 in 1952 to secure her interest in her share of the inheritance which he was using. The $25,000 mortgage was purportedly given to his sister in 1952 when Louis was contemplating remarriage. It was recorded either a day before, or on the same day, or on the day after he received a letter from the revenue agents advising him that they were investigating his tax returns. Louis' testimony was so replete with inconsistencies, parts of his story were so incredible, and his demeanor on the witness stand was such that it is impossible to determine what part of his testimony, if any, to believe. The only*237 direct corroboration of any part of Louis' story was in the testimony of his uncle Salvador, who was 88 years old and who Louis claimed was too feeble to travel to Boston for this trial, and his cousin, Miguel Diep. The testimony of both of these witnesses was taken by written interrogatories in Mexico after the trial and the Court had no opportunity to observe them as witnesses. While they both testified that they were present when Salvador turned over Alberto's estate to Louis, and that the amount was $75,000 in American cash, neither one of them knew anything about the checks or what Louis had done with the money after Salvador turned it over to him. Louis testified that he did not take the money out of Salvador's house when it was turned over to him, yet the testimony of these two witnesses implies that he did. Their testimony with reference to Louis' work and schooling while in Mexico was also directly contradictory of Louis' testimony in this regard. Under the circumstances, we cannot accept the testimony of these two witnesses at face value. Petitioners produced as a witness, Errol Potter, a former employee of the gas company, who testified that he was in Louis' office one*238 evening in 1939 to collect a gas bill, when Louis opened his safe to get the money for the bill. He said he saw a lot of money in the safe, but could not say how much or in what denominations the bills were. The only other evidence on this point was an affidavit of Homer Smith, a deceased friend of Louis', taken in 1958 in which he said that about 15 or 16 or more years ago Louis had shown him a check for $20,000 drawn on a Mexican bank. Respondent objected to the admission of the affidavit. Even if the affidavit is admissible as evidence, which we seriously doubt, it would be of little help to petitioners. In fact, it is somewhat inconsistent with the testimony of Louis and Potter. Louis testified that he held the two small checks for a while after he received them in late 1938 or early 1939 and then cashed them. Potter testified he saw cash in Louis' safe in the fall of 1939. This would indicate that the two smaller checks were cashed in 1939. Yet Smith's affidavit would place the time he saw the $20,000 check sometime in 1942 or 1943, or at the earliest in 1940. It also seems strange that Louis would have shown this check to anyone in a town the size of Morrisville if he was trying*239 to keep his wife from knowing of his inheritance. If Louis had such a cash hoard and did not use the bulk of it until 1949, it seems likely someone else would have known about it, particularly after 1943 when there was no longer any reason to hide it from his former wife. Yet petitioners produced no witnesses other than Louis who testified anything about the cash after 1943; even Connie Ryback, who worked for Louis from 1943 to 1952 and who handled and recorded the business receipts, said nothing about a cash hoard. Viewing the evidence in its entirety, we find no basis for giving petitioners credit for cash on hand as an asset at the beginning of the net worth period. While the deficiencies produced by the net worth computation are not too consistent in amounts from year to year, the burden is on petitioners to show wherein they are wrong, and this they have failed to do. We have found as a fact that Louis had unreported income in each of the years 1944 through 1952, and that petitioners had unreported income in each of the years 1953 through 1955 in the amounts determined by respondent, adjusted with respect to automobiles, depreciation reserves for automobiles, and nondeductible*240 losses on the sale of automobiles in accordance with the stipulation of facts. We come next to the issue of fraud. The computation of increases in net worth plus nondeductible expenditures for a period of 12 years, showing substantial yearly net worth increases in excess of reported income, absent any credible explanation, is persuasive - and here, compelling - evidence of income omitted from petitioners' returns and, in at least the years 1952 through 1955, from Louis' books and records. ; , affirmed per curiam (C.A. 6, 1957); , affirmed sub nom. (C.A. 7, 1956); The parties agree that Louis omitted specific amounts or rental income from his returns for each of the years 1944 through 1951. It is also apparent that receipts from his sign business went unrecorded in his records for the years 1952 through 1955. The understatements of income were consistent and substantial and point to a pattern of 12 years' duration. Louis' *241 plea of guilty to criminal charges of tax evasion for the years 1949-1951 constitutes an admission that his conduct in failing to report income was motivated by fraudulent intent. Petitioners have endeavored to show that a bookkeeper, Connie Ryback, and later Jean were solely responsible for the records and the entries made in them. But the evidence indicates that Louis had access to receipts from his businesses and rental properties and that, even though Connie may have made a conscientious effort to record (either as drycleaning income or as rental income) all the receipts that passed through her hands, some receipts were never brought to her attention. Certainly, receipts from the sign business were not recorded by her, and so far as is indicated by the record herein, Connie was never aware of, and had no responsibilities with respect to, the sign business income. Furthermore, Connie did not prepare by herself the summary sheets from which Louis' tax returns were prepared; the evidence is clear that at least one other person made entries on the sheets. Whether Louis did or did make such entries is not certain, but it was his ultimate responsibility to check the figures that were*242 given to the person who completed his return forms for him, and we are of the opinion that he, in fact, did check the figures that were given to the person who completed his return forms. Petitioners' own evidence that Connie recorded all receipts that came into the stores and that for the years 1952-1955 the books could be reconciled with the bank deposits and the tax returns, when compared with the unquestioned and unexplained increase in net worth for those years, impels the conclusion that a large amount of gross receipts did not reach the stores and were not recorded on the books. So far as we can determine, Louis, who used the funds, is the most likely person to have received them. We do not believe that the persistent omissions of income can reasonably be attributed to error, oversight, negligence, or inadvertence. They strongly indicate, and we find, fraud on Louis' part with respect to his returns for each of the years 1944 through 1955. It follows that the assessment and collection of any deficiencies due from Louis for any of the years 1944 through 1951 are not barred by the statute of limitations. The additions to tax for fraud are also sustained for each of the years*243 1944 through 1955. Although petitioners alleged errors in the determination of additions to tax under section 294(d)(1)(A) for the years 1944, 1946 through 1952, and 1954, and under section 294(d)(2) for the years 1945 and 1953, they have adduced no evidence on these issues and we are constrained to hold for respondent in the absence of proof. The computation of increases in net worth plus nondeductible expenditures submitted by respondent on brief herein indicate a deviation from the computation of increases in net worth plus nondeductible expenditures set forth in respondent's pleadings and in the statutory notice, with respect to automobiles, the reserve for depreciation for automobiles, and the loss on sales of automobiles for the years 1952 through 1955. It would appear that the computation submitted on brief is based upon the stipulation of facts. However, the parties have not stipulated the useful life of the automobiles involved and we are unable to determine precisely how respondent has arrived at the amounts included in the computation which he has submitted on brief. Petitioners took no issue with respondent's computations, and it would appear that respondent's computations*244 are correct except that the reserve for depreciation at the end of 1952 may be understated while the similar reserve at the end of 1953 may be overstated, with the possible result that some $400 in adjusted gross income has been switched by respondent from 1953 to 1952. If we are correct in this conclusion, which can only be determined with accuracy by the parties, effect should be given the correction on a Rule 50 computation. In any event this conclusion could not affect the findings which we have made with regard to the primary issue herein. Decisions will be entered under Rule 50. Footnotes1. Subject to possible correction in accordance with the last paragraph of the Opinion.↩